THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DION J. COOPER,<br>Defendant. | No. CR23-074-RSM<br><br>DION COOPER'S SENTENCING MEMORANDUM |

Dion Cooper, through counsel, asks this Court to impose a five-year probationary sentence in this case. The best way to achieve the sentencing goals set out by Congress *and* to make a difference in the communities most impacted by gun violence—including Dion's community—is to impose a probationary sentence. The Court should also impose a condition requiring Dion to engage in community service with organizations committed to curbing gun violence on a local level.

Criminalizing young Black men and removing them from their families for firearm offenses has not curbed gun violence.[1] Instead, disenfranchising and disempowering men like Dion with felony convictions and through mass incarceration

[1] "Black Americans were nearly 14 times as likely to be murdered by firearm as their white counterparts in 2021. Young Black males ages 15-34 made up 2% of the U.S. population but account for 36% of all firearm homicide fatalities that year. Gun violence is the leading cause of death for Black males ages 15-34." Ari Davis, *et al.*, *U.S. gun violence in 2021: An accounting of a public health crisis*, Johns Hopkins Center for Gun Violence Solutions (2023), available at https://publichealth.jhu.edu/sites/default/files/2024-01/2023-june-cgvs-u-s-gun-violence-in-2021-v3.pdf.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

has harmed the very communities the government aims to protect. The government asks this Court to take the "opportunity to recognize the substantial harms of [straw purchasing] and send a message of general deterrence through its sentence" by imposing a high-end 41-month sentence. The defense asks the Court to take this opportunity to recognize that the government's strategy has failed over and over and over again, and it is time to try something now. There are evidence-based practices that have shown promise in curbing community gun violence. *See* Johns Hopkins Bloomberg School of Public Health, Center for Gun Violence Solutions Studies, available at https://publichealth.jhu.edu/center-for-gun-violence-solutions/solutions (discussing community-violence intervention as one of five evidence-based policies and strategies to curb gun violence). The government's identification and prosecution of Dion as a source of firearms is certainly part of this strategy—eliminating a source of firearms into his community. He has sustained a felony conviction. He no longer can purchase firearms for himself or others. This goal has been achieved.

However, the government's arguments for a lengthy sentence are not supported by either research or reality. The argument entirely ignores the studies and evidence, available for decades, concluding that lengthy periods of incarceration do *not* impact deterrence and do *not* promote respect for the law, and prisons do *not* provide any real opportunity for growth or encourage individuals to live better lives upon release. In fact, study after study has shown that lengthy sentences do far greater harm than good under every sentencing rubric.

Dion could and should be part of the justice system's strategy to curb gun violence, not a byproduct. Specifically, Dion can be an integral part of community-violence intervention through participation in local community organizations, by remaining in his community as a father and mentor, and by sharing his story in an effort to dissuade others from following in his footsteps.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## I. DION COOPER[2]

The PSR accurately lays out Dion's history and characteristics. He remembers his childhood as a happy one. He found it easy to get along with his classmates and peers. His family was not emotive, but he knew he was loved by his mother and father. He was not particularly close with his older siblings, but in some ways, this was a blessing—he was able to maintain his autonomy when he saw his brother slipping into negative environments and peer groups.

### A. Adolescence and Grief

Dion was a decent student throughout elementary and middle school. His mother remembers that he did not give her any trouble as a younger child. *See* Ex. 2 (Linda Cooper's letter). But Dion's life changed drastically once he entered high school.

Notwithstanding the government's minimization of the trauma and grief Dion has experienced losing so many loved ones to gun violence, this was the defining experience of his transition into adulthood. Suddenly violent death became ever-present. It was an unexpected and unwelcome part of his daily experience that he had no control over during the most formative time in his life. During adolescence, our sense of self undergoes significant transformation. Increasing societal expectations and confusing physical development underlie a period of uncertainty and recalibration. Research suggests that, during this critical phase, young people are more susceptible to influence by their social circle due to the incomplete development of their brains.[3] As

---

[2] Defense counsel wants to extend gratitude to Dominic Benavides, a former MSW intern at the Office of the Federal Public Defender for Western Washington, for the research and mitigation work he conducted on behalf of Dion in preparation for this sentencing.

[3] Erik Erikson, "Ego Identity and the Psychosocial Moratorium," *New Perspectives for Research on Juvenile Delinquency*, U.S. Children's Bureau: Publication No. 356, at 1–23 (H.L. Witmer and R. Kotinsky, eds. 1956).



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Dion watched crime and violence begin to seep into his peer group, he felt unprepared and unsure of how and where he fit in.

Dion felt like he was ready for high school academically, but suddenly his social landscape became more difficult to navigate. The people he was closest to in elementary and middle school began affiliating with groups he wasn't interested in and, eventually, turned to criminal activity. Some began using harder drugs. Some began getting arrested. As reflected in Dion's criminal history, his association with individuals involved in crime has led to interactions with law enforcement, but Dion has never been an instigator or perpetrator of criminal behavior before this.[4]



*Dion in 9th grade*

As Dion struggled to find his way and determine who he was, his close friend was fatally shot after the Kent Cornucopia Days festival.[5] This was the first time Dion lost a friend to gun violence, and he began what would be a continuous cycle of suffering community-violence-related losses. Dion's place in all of this was always

---

[4] The government makes a troubling argument that Dion's criminal history is understated, specifically referencing arrests that were either not prosecuted or dismissed. The courts and prosecutors who reviewed the allegations and evidence in the specific cases referenced by the government determined that prosecution was not warranted or dismissal was. That is what should be considered by this Court, not the government's baseless and uninformed retrospective attempt to use these dismissed or uncharged cases against him.

[5] W. Service, *Charge filed in fatal shooting of Renton teen in Kent July 12*, RENTON REPORTER, July 21, 2008, https://www.rentonreporter.com/news/charge-filed-in-fatal-shooting-of-renton-teen-in-kent-july-12/ (last accessed Oct. 28, 2024).



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

unclear to him. He wanted his friends to be safe and wanted to stay out of trouble. Everyone he knew had guns, was looking for guns, or was selling them. Dion, himself, lawfully owned guns. He lived in communities where drive-by shootings, gunshots in the middle of the night, robberies, and gang-related gun violence were ubiquitous. Dion knew the people being killed by guns—they are more than just statistics or talking points or "victims" to him. They are human beings whom he has loved and with whom he has joked and texted and driven around listening to music and shared meals. They are people he has grieved and mourned since he was a teenager. They were his community.

### B. Focus on His Family

Even before his arrest in this case, Dion's life was undergoing major changes. At age 31, he had a strong employment history but primarily worked in minimum-wage service jobs. These positions did not provide him with any extra money but allowed him to scrape by and support himself and his family. After Child Protective Services became involved in the life of his two daughters, Dion took full responsibility for them while their mother dealt with her own demons.

Dion began working with the Washington Department of Children, Youth, and Families (DCYF) to gain permanent custody of his children. Because he was cooperative during the intervention and compliant with all requirements, DCYF agreed to begin a "Trial Return Home." This gave Dion the opportunity to engage in programming, educate himself on how to be a better parent, and, eventually, receive full custody of his children. This has been the goal he has worked toward over the past year.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**



Early on in this process, Dion experienced a huge setback when his residence was destroyed by fire.[6] He and his daughters had to move back in with his mother, who was the permanent caretaker for Dion's niece. Shortly thereafter, Dion began having grand mal seizures—experiencing three in the month prior to his arrest. In some ways, moving back home and being forced to slow down because of his medical condition was an opportunity for him to both learn from and support his mother. On any given day over the past two years, Dion assumed the role as the only father figure for six children in his family: three of his own children, two of their siblings, and his niece.






[6] Kevin Ko, *Lynnwood apartment fire that forced more than a dozen out of homes now being investigated as arson*, KIRO 7 NEWS SEATTLE, Aug. 23, 2022, https://www.kiro7.com/news/local/flames-lynnwood-apartments-force-more-than-dozen-out-homes/TNF6TTSR3FHE7CJUJ5LWA2UUBQ (last accessed Oct. 28 2024).



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Eventually, Dion secured permanent housing for himself, his two children, and their mother. Although not romantically involved, he and his daughters' mother have established a healthy co-parenting relationship as each of them seeks to better themselves as parents. Dion also co-parents another of his children, Z., although they do not reside together. And he remains responsible for his niece's care approximately three days a week.



Dion's approach to parenting is characterized by hypervigilance and a deep concern for his children's safety and well-being, reflecting his love and aspirations for their future. His mother's description of him as a parent confirms his attentive and protective nature, as does his drive and success in securing permanent custody of his daughters. In fact, Dion has been so engaged and involved in this process that he has been invited to speak to a group of other men in similar situations through D.A.D.S., a local organization specifically dedicated to supporting fathers and men by modeling healthy and loving relationships.

Dion has found his identity. In many ways, this case provided him with the incentive to settle on that identity and solidify it. Dion Cooper is a father. He is someone who wants to model being a good, present, and protective parent to his children and to others who might find themselves in similar situations—encouraging others to choose themselves and their families before anything else.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## II. NATURE AND CIRCUMSTANCES OF THE OFFENSE

The defense does not in any way diminish the seriousness of Dion's conduct. Dion does not in any way minimize it. Without prompting, Dion started his letter to this Court as follows:

> First off I know my court papers say there was no victims in these crimes I pled guilty too but, I feel otherwise and I just wanted to apologize to anyone who may have been or in the future will be a victim of gun violence. I realize my actions that got me here today are much bigger than me. They not only affect my family. But they affect the community and other families as well.

Ex. 1 (Dion's letter). He notes that he now understands the "ripple" that his actions created, despite this never being his intent.

To argue that Dion should have "known better" because of his own personal losses to community violence removes humanity from the calculus of his decisions. He committed this "crime[] outta the interest of others and I wasn't putting myself first. I wasn't thinking my actions could not only put me[] but innocent people in harms way." Ex. 1. Dion's mindset when he committed these crimes was that everyone had a gun, everyone needed a gun, and he was making sure that people he cared about and the people they cared about weren't caught out there without one. His mindset now is almost the complete opposite—everyone does not need a gun and, in fact, the more guns out there, the more dangerous his community is.

## III. DETERRENCE, REHABILITATION, AND THE KINDS OF SENTENCES AVAILABLE

The government's argument that the Court should sentence Dion to the high end of the Guidelines to promote "general deterrence" should be rejected outright. While his arrest and prosecution may have served some kind deterrent purpose, a lengthy prison sentence does not. And the government knows this. For decades its own research has shown that lengthy sentences do not deter crime, either generally or individually. *See Five Things About Deterrence*, June 5, 2016, available at



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

https://nij.ojp.gov/topics/articles/five-things-about-deterrence; *see also Deterrence, Firearms Arrests, and Subsequent Shootings*, Aug. 2012, available at https://nij.ojp.gov/library/publications/deterrence-firearm-arrests-and-subsequent-shootings-micro-level-spatio. Yet the government continues to argue this debunked theory over and over.

This Court can deter Dion and simultaneously create a positive impact on the community through a probationary sentence with a targeted and meaningful community service requirement. While the Department of Justice recently provided substantial funding to organizations focused on community violence intervention, these programs need sustained resources, manpower, and time to begin showing results. *See* Kristian Jones & Julia Schleimer, *Violence Intervention Programs Need Time to Demonstrate Impact*, THE SEATTLE TIMES, July 8, 2024, available at https://www.seattletimes.com/opinion/violence-intervention-programs-need-time-to-demonstrate-impact/. Dion's participation could be invaluable to these programs. He is caring, thoughtful, and wonderful with kids. He life has been repeatedly impacted by gun violence; he understands the grief and trauma of living with this loss. And, most importantly, he can share the lessons he has learned through his prosecution in this case—that there is no rationalization for conduct contributing to gun violence, even if it is someone else who poses the direct and imminent danger.

Deterrence also will be achieved by requiring Dion to seek out a mental health assessment and attend therapy. Dion has been navigating life without the essential coping mechanisms necessary to manage the profound grief from the traumatic losses he has encountered. Working through this grief will help avoid the kind of distorted and hopeless thinking that led him to engage in this crime.

Dion has already proven that prosecution of this offense has achieved individual deterrence—without any custodial sanction. He says that he "honestly really wanted to



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

thank the judge who released me on bail for this case because in the last year and a half I have seen my life transform in ways I never would of imagined." Ex. 1. He has spent the last year on supervision eliminating negative influences and peers, focusing solely on himself, his family, and his future. He has taken this period seriously, knowing that it is his opportunity to show this Court that he is not simply giving lip service to this transformation. In fact, his Pretrial Services officer went so far as to comment that his "dedication to being a present father was evident throughout supervision . . . . Should Mr. Cooper choose to continue to remove negative influences in his life, Mr. Cooper can be a law-abiding member of the community." Pretrial Services Release Status Rpt. dated October 18, 2024.

Finally, a probationary sentence is warranted in this case to avoid significant harm to Dion's family, who rely on him for financial and emotional stability, as well as housing security. Dion was able to secure Section 8 housing for himself and his children. They attend school near their home, and Dion has found work that allows him to be present for both his children and his niece. He is their primary caretaker, bringing them to doctor's appointments, school, extracurriculars, staying home with them when they are sick, and helping them with homework. He is also the key to their continued housing. If incarcerated for longer than four months, it is likely that Dion and his family will lose their Section 8 housing. And without his assistance, his mother will struggle to care for all three children that Dion parents, as well as being the backup for her other grandchildren, which she always will be.

Imposing a prison sentence of 41 or even 24 months will result in severe and unnecessary harm to Dion's children. Research consistently emphasizes the negative effects of parental incarceration; children with incarcerated fathers are more likely to exhibit behavioral problems, including physical aggression and depression and



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

anxiety.[7, 8] Children with incarcerated parents are also more likely to struggle academically and socially.[9] This is particularly concerning for Dion when it comes to his eldest daughter, who is approaching the complicated transition from elementary to middle school—a period that is especially challenging for young girls. We know that incarceration does not solely impact the individual in custody; the adverse consequences extend to their children.

This is Dion's greatest fear. He recognizes that his actions had far-reaching consequences. He also recognizes that those close to him have been hurt by his crimes. He feels this most acutely when he imagines being away from his children after spending years reinforcing his presence and love for them through his actions and commitment.

Dion's adoration of and dedication to his children have always been there. However, after his arrest in this case, he separated himself from anyone other than his children, close family, support system, and those related to his employment. When someone begins casually discussing criminal behavior or activity, Dion sees through it. He knows there is no path forward for him in that conversation. He recognizes that his instinct to protect and please people does not serve him unless it is aimed inward toward himself and his family. And his actions since his arrest have shown the Court he is serious and committed to this shift in his focus.

---

[7] Megan Comfort, *et al.*, *Taking children into account: Addressing the intergenerational effects of parental incarceration*, CRIMINOLOGY & PUBLIC POLICY, 10*(3), 839–50 (2011), available at https://doi.org/10.1111/j.1745-9133.2011.00750.x.

[8] Sara Wakefield & Christopher Wildeman, *Mass imprisonment and racial disparities in childhood behavioral problems*, CRIMINOLOGY & PUBLIC POLICY, 10(3), 791–92 (2011), available at https://doi.org/10.1111/j.1745-9133.2011.00741.x.

[9] Holly Foster & John Hagan, *Incarceration and intergenerational social exclusion, Social Problems*, OXFORD UNIVERSITY PRESS, 54(4), 399–433 (2007), available at https://www.jstor.org/stable/10.1525/sp.2007.54.4.399.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## IV. CONCLUSION

As the government states in its own memorandum:

> Gun violence is a complicated issue with several contributing factors and potential solutions. No single solution will fix this epidemic. But it is critical that, as one part of the overall solution to a complex problem, we continue to hold people accountable for breaking laws that exist specifically to reduce and prevent gun violence.

Dkt. 54 at 7.

That critical piece has been achieved. Dion has been held accountable for breaking the law. He has been prosecuted. He has sustained his first felony conviction. His life has been forever altered, and he will suffer the lifelong consequences of his actions, not least of which is the enduring guilt for the unintended consequences of putting members of his community in greater danger.

While gun violence is a complicated issue, we know that the imposition of lengthy sentences does nothing to solve it. The criminal justice system's default of returning again and again to retribution and punishment is not making us safer, is not fostering respect for the law, and is failing the communities that need it the most.

The defense asks this Court to take a different position here. Imposing a five-year probationary sentence allows the Court to see the result of this strategy. It can follow Dion's path and positive contributions for a longer period, and it will also have the ability to question or sanction any conduct that demonstrates a return to negative associations or behavior. Keeping Dion home and active in his community best serves the sentencing goals in this case.

DATED this 28th day of October 2024.

Respectfully submitted,

s/ *Sara Brin*
Assistant Federal Public Defender
Attorney for Dion J. Cooper



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**